**PUERTO RICAN ORGANIZATION FOR POLITICAL ACTION et al.,**
Plaintiffs-Appellees,

v.

Stanley T. KUSPER et al.,
Defendants-Appellants.

No. 73–1035.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 31, 1973.

Decided Dec. 18, 1973.

Aldus S. Mitchell, Jr., Andrew M. Raucci, Chicago, Ill., for defendants-appellants.

Donald T. Bertucci, Wallace C. Winter, George C. Pontikes, Chicago, Ill., for plaintiffs-appellees.

Cesar A. Perales, Herbert Teitelbaum, New York City, for Puerto Rican Legal Defense and Education Fund, Inc., amicus curiae, for plaintiffs-appellees.

Before KILEY, PELL and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This appeal challenges the propriety of a preliminary injunction entered October 30, 1972, requiring the Chicago Board of Election Commissioners to provide voting assistance in Spanish to U.S. citizens born in Puerto Rico who are unable to read or understand English.

One plaintiff, the Puerto Rican Organization for Political Action, is a not-for-profit corporation which seeks to further the participation of Spanish-speaking residents of Illinois in the political process. The four individual plaintiffs and the class they represent are citizens of the United States by virtue of their birth in Puerto Rico. They were educated in Puerto Rican public schools, where the language of instruction is Spanish. They are now residents of Illinois and are registered to vote in Chicago. After hearing testimony and examining affidavits of class members, the district court found that plaintiffs and "many thousands" of other class members do not understand enough English to be able to vote effectively unless they have written instructions or verbal assistance in Spanish.

After the complaint was filed in September, the district court held a series of conferences with counsel for plaintiffs and for the defendant election commissioners to determine what kind of assistance in Spanish could be provided for the general election to be held November 7, 1972. Without conceding the merits of the complaint, defendants decided to make certain assistance available, but refused to enter into an agreement embodying their decision. The district judge, following a three-day hearing, entered the preliminary injunction, which apparently orders defendants to take the steps they said they intended to take.

The first two sections of the preliminary injunction apply only to the November 7 election. They required the election commissioners to print Spanish translations of directions for using voting machines to be pasted over English

instructions on specimen ballots. These ballots, along with posters in Spanish about assistance available to voters and cards in Spanish describing model voting machines, were to be placed in the polling places of various precincts of eleven wards.

Sections C and D of the preliminary injunction require defendants to "make all reasonable efforts" to appoint election judges who are bilingual in English and Spanish to fill vacancies in the designated precincts. Section E ordered reasonable efforts to place bilingual special judges in the specified polling places for the November 7 election.

[1] Before considering the merits of the appeal, we should mention that plaintiffs moved to dismiss the appeal as moot because the November 7 election was over. A single judge of this court denied the motion on April 12, 1973. The basis of the denial was that the provisions of sections C and D of the preliminary injunction are not limited to the November 7 election. The election commissioners have the ongoing duty to fill vacancies as they occur. Ill.Rev. Stat. ch. 46, §§ 14–3.1, 14–3.2, 14–5. A number of special elections have been held in the year since the injunction was entered; the injunction continued to enforce defendants' responsibility to appoint bilingual judges for those elections. Therefore the appeal is not moot.

I

Defendants' first objection to the preliminary injunction is that the district court, acting as a single judge, had no jurisdiction to enter it. They argue that the injunction restrains them from enforcing state statutes on grounds of unconstitutionality, and thus could only have been issued by a three-judge court under 28 U.S.C. § 2281.

Defendants say the injunction requires them to violate a provision of the 1870 state constitution, Schedule § 18, S.H.A., which they claim is still in force.[1] They cite cases [2] interpreting section 9 of the transition schedule of the 1970 state constitution; [3] but neither case holds that a substantive provision of the 1870 constitution remains in force if it is not incorporated into the 1970 constitution. Section 18 no longer governs the Board of Election Commissioners.

Next, defendants cite an injunction issued in City of Chicago v. McCoy, 136 Ill. 344, 26 N.E. 363 (1891). They argue the injunction prohibits them from publishing any material in any language but English. By its terms, however, the *McCoy* injunction only prohibits execution of a contract between the city and a German-language newspaper. The *McCoy* injunction never did apply to defendants.

Another provision defendants allege is affected by the district court's injunction is Ill.Rev.Stat. ch. 127, § 177: "The official language of the State of Illinois is English." This statute (which appears with others naming the state bird and the state song) has never been used to prevent publication of official materials in other languages. In fact, various state and city agencies publish numerous materials and provide many services in Spanish.[4]

---

1. "All laws of the state of Illinois, and all official writings, and the executive, legislative and judicial proceedings, shall be conducted, preserved and published in no other than the English language."

2. Johnson v. State Electoral Board, 53 Ill.2d 256, 290 N.E.2d 886 (1972); Mullaney, Wells & Co. v. Savage, 5 Ill.App.3d 1, 282 N.E.2d 536 (1972).

3. ". . . All laws, ordinances, regulations and rules of court not contrary to, or inconsistent with, the provisions of this Constitution shall remain in force, until they shall expire by their own limitation or shall be altered or repealed pursuant to this Constitution. . . ."

4. See Ill.Rev.Stat. ch. 5, § 169; ch. 16¾, §§ 14.40 and 18a; ch. 122, § 34–18.2. Appendix A to plaintiffs' brief in this court is a three-page list of materials printed in Spanish by various agencies of the City of Chicago.

■ Defendants also argue that the preliminary injunction prohibits enforcement of Ill.Rev.Stat. ch. 46, § 14–1 et seq., which governs the appointment of judges of election. Their argument is based on the misinterpretation that the injunction imposes a "quota system" on the Board. On the contrary, the injunction only asks for defendants' "reasonable efforts" to appoint bilingual applicants who meet the other qualifications of the election code.[5]

■ We conclude that no Illinois law prohibits defendants from giving voting assistance in Spanish. Even if there were such a statute, defendants' objection to the district court's jurisdiction would not prevail. Plaintiffs' complaint about the practice of the Board of Election Commissioners of refusing assistance in Spanish is not that it is unconstitutional, but that it conflicts with the Voting Rights Act of 1965 and the Voting Rights Act Amendments of 1970 (see Part II below). A Supremacy Clause case, where repugnance of a state practice to a federal statute is claimed, does not require a three-judge court under section 2281. Swift & Co., Inc. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965); Santiago v. Corporacion de Renovacion Urbana y Vivienda, 453 F.2d 794 (1st Cir. 1972); Johnson v. Harder, 438 F.2d 7 (2d Cir. 1971). The district court had jurisdiction to enter the preliminary injunction.

## II

■ United States policy toward persons born in Puerto Rico is to make them U.S. citizens,[6] to allow them to conduct their schools in Spanish, and to permit them unrestricted migration to the mainland.[7] As a result, thousands of Puerto Ricans have come to live in New York, Chicago,[8] and other urban areas; they are eligible, as residents and U.S. citizens, to vote in elections conducted in a language many of them do not understand. Puerto Ricans are not required, as are immigrants from foreign countries, to learn English before they have the right to vote as U.S. citizens.[9] Their plight is as much a result of government policy as is the plight of Negroes trying to pass literacy tests in states which had subjected them to segregated, unequal school systems. Cf. Gaston County v. United States, 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969).

Congress responded to the inequities caused by literacy tests by outlawing them in states with low percentages of registrants or voters. Voting Rights Act of 1965, 42 U.S.C. § 1973 et seq. In the same act, Congress buttressed the

---

5. Defendants argue that a quota system for bilingual election judges would violate the doctrine of Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971). If the district court's permanent injunction were to order one or two bilingual judges for the designated precincts, we doubt that it would conflict with Whitcomb v. Chavis. Election judges are not elected and do not represent any constituency. Their ministerial duties include assisting voters to use the election machinery. Therefore their ability to communicate with the voters in their precincts is highly relevant to their qualifications.

6. 8 U.S.C. § 1402.

7. Spanish has been the language of instruction in Puerto Rican schools in all grades since 1947; English is taught as a second language. The free migration policy has been in force since 1917. United States v. County Board of Elections, 248 F.Supp. 316, 319 (W.D.N.Y.1965), appeal dismissed for lack of jurisdiction, 383 U.S. 575, 86 S.Ct. 1077, 16 L.Ed.2d 107 (1966).

8. A study by a city agency reports that the Spanish-speaking population of Chicago was 247,343 in 1970. Of those, about half were Puerto Rican; the rest were Mexican-Americans. Chicago Sun-Times, Dec. 9, 1973, at 56, col. 1.

9. 8 U.S.C. § 1423.

right of Puerto Ricans [10] to vote in the following language:

> Congress hereby declares that to secure the rights under the fourteenth amendment of persons educated in American-flag schools in which the predominant classroom language was other than English, it is necessary to prohibit the States from conditioning the right to vote of such persons on ability to read, write, understand, or interpret any matter in the English language.

42 U.S.C. § 1973b(e)(1). The Supreme Court upheld the constitutionality of this provision in Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).

Section 4(e)(2) of the 1965 act allows the states with valid literacy tests to continue using them, but prevents their application to any person who completed sixth grade (or whatever grade is presumptive of literacy under the state law) in a Puerto Rican public school. The 1970 amendment extends the ban on literacy tests to all states until August 6, 1975. 42 U.S.C. § 1973aa. This provision was upheld in Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). The combined effect of the 1965 act and the 1970 amendment is to prohibit the states from conditioning the right to vote of persons who attended any number of years of school in Puerto Rico on their ability to read or understand the English language.

The meaning of "the right to vote" is the critical analysis in this case. Defendants believe it is the right to enter a voting booth and cast a ballot. Plaintiffs urge a broader definition of "the right to vote," based on several three-judge-court cases involving illiterate voters. In Garza v. Smith, 320 F.Supp. 131 (W.D.Tex.1970), vacated and remanded for appeal to 5th Circuit, 401 U.S. 1006, 91 S.Ct. 1257, 28 L.Ed.2d 542, appeal dismissed for lack of jurisdiction, 450

F.2d 790 (5th Cir. 1971), the court rejected a narrow definition of "the right to vote." It "additionally includes the right to be informed as to which mark on the ballot, or lever on the voting machine, will effectuate the voter's political choice." 320 F.Supp. at 136. The court found a denial of equal protection in a statute which allowed assistance to blind or physically infirm voters, but denied it to illiterates. An illiterate voter can only perform an empty ritual if he does not have "the right to be informed of the effect that a given physical act of voting will produce." 320 F.Supp. at 137.

A Louisiana district court found a state statute denying voting assistance to illiterates in conflict with the ban on literacy tests in the Voting Rights Act of 1965. United States v. Louisiana, 265 F.Supp. 703 (E.D.La.1966), aff'd without opinion, 386 U.S. 270, 87 S.Ct. 1023, 18 L.Ed.2d 39 (1967). The court said, "We cannot impute to Congress the self-defeating notion that an illiterate has the right [to] pull the lever of a voting machine, but not the right to know for whom he pulls the lever." 265 F.Supp. at 708.

In United States v. Mississippi, 256 F.Supp. 344 (S.D.Miss.1966), the court read into the 1965 Voting Rights Act a requirement that the state provide assistance to illiterate voters. In both the Mississippi and Louisiana cases, the courts entered injunctions requiring election officials to assist illiterates as a protected class under the Voting Rights Act.

A case which goes even further in ordering state officials affirmatively to guarantee to a protected class of voters their right to an effective vote is United States v. Post, 297 F.Supp. 46 (W.D.La. 1969). Election officials published information that pulling a party lever would cast votes for all the party's nominees, in the special as well as the general election. The party nominee in the

10. Apparently this section applies only to persons educated in Puerto Rico. Katzenbach v. Morgan, 384 U.S. 641, 645 n. 3, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).

special election, a Negro, campaigned in the Black community by asking his supporters to pull the party lever. Later the officials discovered that the machines could not be set up to include the special-election nominee under the party lever. Though acting in good faith, they did not effectively convey the new instructions to the election judges, to the voters, or to the Negro nominee in the special election. As a result, a number of voters, who thought they were voting for the Negro nominee by pulling the party lever, failed to cast a vote for him.

The court found that under the Voting Rights Act the defendants had a duty "to refrain from applying any voting procedure which will have the effect of denying to Negro voters the right to cast effective votes for the candidate of their choice." 297 F.Supp. at 51. The special election was voided and a new election ordered.

We agree with the interpretation of the cases above that "the right to vote" encompasses the right to an effective vote. If a person who cannot read English is entitled to oral assistance, if a Negro is entitled to correction of erroneous instructions, so a Spanish-speaking Puerto Rican is entitled to assistance in the language he can read or understand. Since the voting rights of plaintiffs and their class are protected by the 1965 act (with the 1970 amendment), their complaint states a cause of action for which a federal court can give relief. The preliminary injunction properly protected their rights in the 1972 general election by requiring the election commissioners to provide voting assistance in Spanish.[11]

The judgment is affirmed and the case is remanded to the district court for further proceedings.

---

11. We note that a district court in New York issued similar injunctions on March 21 and April 20, 1973, in Lopez v. Dinkins, No. 73 Civ. 695 (S.D.N.Y.). The California Supreme Court, however, refused to order a "bilingual electoral apparatus" in Castro v. California, 2 Cal.3d 223, 85 Cal.Rptr. 20, 466 P.2d 244 (1970). *Castro* can be distinguished because it was not brought under federal voting-rights legislation, and because plaintiffs were not members of the class protected by 42 U.S.C. § 1973b(e)(1).